# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| BENCHMARK INSURANCE COMPANY, ) | |
| Plaintiff, ) | 3:14-cv-00326-RCJ-VPC |
| vs. ) | |
| ) | **ORDER** |
| G.L. CONSTRUCTION COMPANY, *et al.*, ) | |
| Defendants. ) | |

This case arises from a dispute between an insured and its insurer regarding the latter's duty to defend the insured party against claims of trespass and property damage resulting from the disposal of construction materials. Pending before the Court is Defendant and Counterclaimant G.L. Construction Company's ("G.L.C.") Motion for Summary Judgment. (ECF No. 20). The Court also has before it Benchmark's Response (ECF No. 24) and G.L.C.'s Reply (ECF No. 32). For the reasons contained herein, G.L.C.'s motion is DENIED.

## I.  BACKGROUND

G.L.C. is a Nevada corporation owned and operated by Gordon Lemich ("Lemich"). (Lemich Decl. ¶ 1, Ex. 2, ECF No. 20). Lemich owned a parcel of real property known as "Comstock Storage" from June 12, 2000 until it was foreclosed by Acquired Capital, Lemich's mortgage holder, on May 9, 2011. (*Id.* ¶¶ 3–4). G.L.C. remained on the property by leasing Comstock Storage from Acquired Capital. When Comstock Storage was sold to Cerberus

1

1   Holdings, LLC on December 28, 2012, G.L.C. continued its lease with the new owner. (*Id.* ¶¶ 5–
2   7). G.L.C. occupied Comstock Storage until May 16, 2013. Throughout the duration of
3   Lemich's ownership and lease of Comstock Storage, G.L.C. occasionally dumped construction
4   material onto the adjoining property ("the Property"). (*Id.* ¶ 22). According to Lemich, he
5   believed that the Property was entirely owned by Truckee Meadows Water Authority
6   ("TMWA") and that he had permission to dispose of his materials on the Property. (*Id.* ¶¶ 25–
7   27). However, in July of 2013, Lemich discovered that he was mistaken when he and his
8   company were sued by Northern Nevada Homes ("NNH"), the actual owner of at least part of
9   the Property, for trespass and destruction to property. (*Id.* ¶ 19). This lawsuit was brought in the
10  Washoe County District Court. The complaint in that case alleged that during Lemich's
11  ownership and tenancy of Comstock Storage, G.L.C. "dumped vast amounts of dirt and other
12  debris onto property owned by NNH." (NNH Compl. 4, 6–7, ECF No. 26-1).
13       On October 23, 2009, G.L.C. purchased a commercial liability insurance policy ("the
14  Policy") from Benchmark in which Benchmark agreed to defend G.L.C. "against any suit
15  seeking [tort damages for property damage]." (Insuring Agreement § I.a, Ex. 1, ECF No. 4). The
16  Insurance Agreement ("the Agreement") signed by the parties contained a number of
17  qualifications, including that the property damage must be caused by an "occurrence" and that
18  the "occurrence" "take[] place during the policy period." (*Id.*). G.L.C. maintained the Policy
19  until October 23, 2013. When Lemich received notice of the NNH lawsuit, he contacted
20  Benchmark's third-party claims administrator requesting that Benchmark provide defense
21  services pursuant to the Policy. This request was denied on August 2, 2013 because the claims
22  administrator concluded that G.L.C.'s dumping of materials had been done intentionally and
23  therefore did not qualify as an "occurrence" under the policy. (Westcap Letter 6, ECF No. 25-1).
24

Because the lawsuit in Washoe County was progressing and Benchmark refused to defend G.L.C., Lemich hired counsel to respond to NNH's allegations. On March 4, 2014 and May 5, 2014, Lemich's counsel made additional demands on Benchmark and its claims administrator to defend G.L.C. against the NNH lawsuit as required by the Policy. On May 29, 2014, Benchmark denied the claim because it found that (1) the dumping happened prior to the policy's inception, (2) the statute of limitations barred NNH's claims, and (3) G.L.C.'s dumping was not an "occurrence" as defined by the policy. (Hansard Letter 5–7, ECF No. 25-4). Benchmark also filed the present action seeking a declaratory judgment that the Policy does not cover property damage caused by G.L.C.'s intentional dumping. G.L.C. responded by filing a counterclaim against Benchmark alleging that the denial of G.L.C.'s insurance claim was done in bad faith. G.L.C. now seeks summary judgment on both Benchmark's complaint and its own "bad faith" claim. G.L.C. also seeks $57,554.41 in attorney's fees and costs that have accrued in defending against the NNH lawsuit.

## II. LEGAL STANDARD

A principle purpose of the summary judgment rule is to "isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). A court grants summary judgment only if "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making this determination, the court "must draw all reasonable inferences supported by the evidence in favor of the non-moving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002). "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 424, 247–48 (1986). Rather,

only genuine issues of *material* facts are relevant to the summary judgment analysis.  A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* at 248.  "The moving party bears the initial burden of establishing the absence of a genuine issue of material fact." *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir. 2000).  The burden is met by demonstrating to the court "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325.  This is done by citing to depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials. Fed. R. Civ. P. 56(c)(1)(A).  Once the initial burden is met, however, "Rule 56(e) requires the nonmoving party to go beyond the pleadings and identify facts which show a genuine issue for trial." *Fairbank*, 212 F.3d at 531.

Moreover, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.  "In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23.  This causes the moving party to be entitled to judgment as a matter of law because the non-moving party failed to sufficiently show facts supportive of an essential element of the case for which she bears the burden of proof. *Id.* at 323.  Conversely, where reasonable minds could differ on the facts proffered in support of a claim, summary judgment should not be granted.  *Petzak v. Nevada ex rel. Dep't of Corr.*, 579 F. Supp. 2d 1330, 1333 (D. Nev. 2008).

///

///

### III. DISCUSSION

G.L.C. argues that summary judgment in its favor is warranted here because there is no genuine dispute of material fact regarding whether Benchmark is obligated to defend it against NNH's claims. Specifically, G.L.C. argues that its dumping on the Property was an accident and therefore is an "occurrence" as defined in the policy. G.L.C. further argues that because NNH alleges that G.L.C. also dumped materials after October 29, 2009 that the subject matter of the lawsuit falls within the coverage period. Benchmark contends that under the Policy G.L.C.'s dumping is not an "occurrence" if its actions were intentional. Benchmark also asserts that the Policy includes other limitations that excuse it from defending G.L.C. in the NNH lawsuit.

### A. Benchmark's Duty to Defend

Nevada law has "long recognized the special relationship between the insurer and its insured." *Powers v. United Servs. Auto. Ass'n*, 962 P.2d 596, 603 (Nev. 1998). Indeed, "[t]he relationship of an insured to an insurer is one of special confidence." *Ainsowrth v. Combined Ins. Co. of Am.*, 763 P.2d 673, 676 (Nev. 1988). The contours of the relationship are shaped by both the insurance contract and the law. *Allstate Ins. Co. v. Miller*, 212 P.3d 318, 330 (Nev. 2009). For instance, the insurer's duty to defend an insured against liability "attaches when the insured tenders defense of the lawsuit to the insurer." *Id.* However, the insurer must defend against a lawsuit only if the suit "potentially seeks damages within the coverage of the policy." *Rockwood Ins. Co. v. Federated Capital Corp.*, 694 F. Supp. 772, 776 (D. Nev. 1988). For this reason, the duty to defend is broader than the insurer's duty to indemnify. While the duty to indemnify arises once liability is proven, the duty to defend is triggered if the claim *potentially* is covered by the policy. *United Nat'l Ins. Co. v. Frontier Ins. Co.*, 99 P.3d 1153, 1158 (Nev. 2004). Nevertheless, "the duty to defend is not absolute." *Id.* (quoting *Aetna Cas. & Sur. Co. v.*

*Centennial Ins. Co.*, 838 F.2d 346, 350 (9th Cir. 1988)). "A potential for coverage only exists when there is arguable or possible coverage." *Id.* To determine whether the duty exists in a particular case, the allegations of the complaint must be compared to the terms of the policy. *Id.*

In this case, the Court finds that summary judgment as to Benchmark's duty to defend G.L.C. in the NNH lawsuit would be improper. Under the Agreement, Benchmark is obligated to defend G.L.C. only if: "The . . . property damage is caused by an occurrence which takes place during the policy period regardless of whether or not such occurrence is known or apparent to anyone." (Insuring Agreement § I.b.(2)). The parties disagree about the meaning of the word "occurrence." The Policy defines "occurrence" as "an accident, including a continuous or repeated exposure to substantially the same generally harmful condition." (*Id.* § V.15). "Accident," however, is not defined. G.L.C. contends that an "accident" arises when the actor does not intend the consequences of an act and a reasonable person in the actor's situation could not foresee the resulting harm. (Defs.' Reply 8, ECF No. 32). Benchmark, on the other hand, argues that the actor's intention to act determines whether the resulting harm is an accident, regardless of whether that harm was foreseeable. (Pl.'s Resp. 13–14, ECF No. 24).

However, the Court here does not reach a legal conclusion regarding the interpretation of the parties' Agreement because it finds that there is a preliminary factual issue that must be resolved. G.L.C. asserts that it did not expect to trespass or cause damage to the Property because it believed the Property onto which it dumped the materials belonged to TMWA from whom Lemich claims he received permission. Benchmark challenges whether Lemich actually believed he had permission and whether he actually believed that the Property onto which he was dumping belonged to TMWA. In support of this contention, Benchmark cites to the deposition of Robert Fitzgerald, the principal of NNH. According to Fitzgerald, when he observed G.L.C.

6

trucks dumping materials on the Property he approached Lemich and asked Lemich to "please stop dumping material on [his] property." (Fitzgerald Dep. 76:18–77:19, ECF No. 25-7). Rather than being confused at Fitzgerald's request or surprised at finding that Fitzgerald was the owner of the Property where G.L.C. trucks were dumping, Lemich's alleged response was that Fitzgerald "shouldn't worry about it" because G.L.C. was dumping "good material," but that he would stop. (*Id.* at 77:21–78:6). There is no evidence in the record that Lemich questioned Fitzgerald's authority regarding the Property or that Lemich contacted TMWA to verify that G.L.C. retained permission to dump materials on the Property. Thus, a reasonable inference from this exchange is that Lemich was not surprised at Fitzgerald's request because either he knew that the Property where G.L.C. was dumping did not belong to TMWA or he knew that he never had permission to dump on the Property in the first place. Because G.L.C. does not offer any other documentation supporting Lemich's claim that G.L.C. truly had permission to dump materials on TMWA's land, or that he was reasonably mistaken that the Property G.L.C. used for dumping belonged to TMWA, the Court finds that a genuine dispute of material fact exists.

This question of fact is "material" to the case because G.L.C.'s alleged mistaken belief that it had permission to dump on the Property is the foundation of its argument that the harm caused by the dumping was an "accident." *See Anderson*, 477 U.S. at 248. If G.L.C. did not have permission from TMWA, or if Lemich knew that the Property where G.L.C. trucks were dumping the materials did not belong to TMWA, then the dumping was not an "accident" under either of the definitions proposed by the parties.[1] And if the dumping was not an "accident," then per the Policy's definition, the dumping could not have been an "occurrence." If G.L.C.'s

---

[1] Where an insurance policy fails to define the word "accident," the Nevada Supreme Court has applied "the common definition of the term," which is "'a happening that is not expected, foreseen, or intended.'" *Beckwith v. State Farm Fire & Cas. Co.*, 83 P.3d 275, 276 (Nev. 2004) (citation omitted). For G.L.C.'s claims to have any merit under this definition, it would need to show that Lemich truly had permission from TMWA and was reasonably mistaken as to the location where the G.L.C. trucks were dumping materials.

7

dumping of materials does not qualify as an "occurrence" under the Policy, then Benchmark has no duty to defend G.L.C. in the NNH lawsuit.  Therefore, the factual dispute regarding G.L.C.'s alleged permission to dump on the Property is alone a sufficient reason to deny summary judgment. *See Petzak*, 579 F. Supp. 2d at 1333 (stating that summary judgment should not be granted if reasonable minds could differ regarding the facts offered to support a claim).

### B.  G.L.C.'s Bad Faith Claim

"To establish a prima facie case of bad-faith refusal to pay an insurance claim, the plaintiff must establish that the insurer had no reasonable basis for disputing coverage, and that the insurer knew or recklessly disregarded the fact that there was no reasonable basis for disputing coverage." *Powers*, 962 P.2d at 604.  The Court's finding that a genuine dispute of material fact exists as to whether Benchmark has a duty to defend G.L.C. in the NNH lawsuit necessarily precludes summary judgment on the allegation that Benchmark denied G.L.C.'s claim in bad faith.  After reviewing the Agreement and the relevant facts, the Court could not say, as a matter of law, that Benchmark has a duty to defend G.L.C. in the NNH lawsuit.  Since there is a legitimate dispute as to Benchmark's duty, the Court cannot find that Benchmark denied G.L.C.'s claims in bad faith.  Indeed, the Court concludes that a finder of fact is required to determine whether G.L.C.'s actions even fall within the purview of the Policy.  Thus, it is impossible for the Court to say, as a matter of law, that Benchmark had no reasonable basis for disputing coverage in this case.

Therefore, G.L.C.'s motion is DENIED.

///

///

///

**CONCLUSION**

IT IS HEREBY ORDERED that G.L.C.'s Motion for Summary Judgment (ECF No. 20) is DENIED.

IT IS SO ORDERED.

Dated: October 29, 2014.

_____
ROBERT C. JONES
United States District Judge