**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| BENCHMARK INSURANCE COMPANY, | |
| Plaintiff, | 3:14-cv-00326-RCJ-VPC |
| vs. | **ORDER** |
| G.L. CONSTRUCTION COMPANY, *et al.*, | |
| Defendants. | |

This case arises from a dispute over insurance coverage between Plaintiff Benchmark Insurance Company ("Benchmark") and Defendants G.L. Construction Company ("G.L.") and Gordon Lemich ("Lemich"). Pending before the Court is Benchmark's Motion for Summary Judgment (ECF No. 74). G.L. and Lemich have filed a Response (ECF No. 78), as has Defendants Cerberus Holdings, LLC ("Cerberus") and Northern Nevada Homs, LLC ("NNH") (ECF No. 83). Benchmark submitted a Reply to both (ECF Nos. 85, 86). Also pending are Motions for Leave to File Excess Pages (ECF Nos. 77, 80).

## I.    FACTS AND PROCEDURAL HISTORY

Lemich is the owner and operator of G.L., which is a Nevada licensed contractor that engages in excavation work. (Lemich Decl. ¶ 2, ECF No. 78-1). On October 23, 2009, G.L. purchased a commercial general liability policy from Benchmark ("the Policy"). The Policy was effective from that date thru October 23, 2013, having been renewed each year by G.L. (*Id.*

¶¶ 17–25).  Pursuant to the Policy, Benchmark agreed to defend G.L. "against any suit seeking [tort damages for property damage.]" (Ins. Agreement, ECF No. 4, at 41).  The Insurance Agreement ("the Agreement") signed by the parties contained a number of qualifications and exceptions, including that the property damage must be caused by an "occurrence" and that the "occurrence" "take[] place during the policy period." (*Id.*).

In June 2000, Lemich and his wife purchased a parcel of property in Reno, Nevada located at 2605 Comstock Drive commonly referred to as "Comstock Storage." (Lemich Decl. ¶ 5).  At the time, Lemich was leasing a parcel of land next to Comstock Storage that he used as an outdoor storage yard. (*Id.* ¶ 4).  In 2002, that parcel was sold to Truckee Meadows Water Authority ("TMWA") and Lemich entered into a lease agreement with TMWA for continued use of the land. (*Id.* ¶ 6).

During his ownership of Comstock Storage, Lemich "caused repairs and improvements to be made" to his property. (*Id.* ¶ 10).  "These improvements and repairs were not made or caused to be made by either [G.L.] or by [Lemich] in [his] capacity as an officer, director or employee of G.L." (*Id.*).  "Simply put, [G.L.] has never been involved in the ownership, maintenance, repair or the improvement of the buildings located [at Comstock Storage]." (*Id.*).  In May 2011, Lemich lost ownership of Comstock Storage through foreclosure proceedings brought by the mortgage provider, Acquired Capital. (*Id.* ¶ 11).

Acquired Capital purchased Comstock Storage out of foreclosure and Lemich entered into a lease agreement to remain on the property. (*Id.* ¶ 12).  Thereafter, Acquired Capital commenced discussions with Cerberus regarding the sell of Comstock Storage.  Allegedly, Acquired Capital was willing to sell Comstock Storage to Cerberus only on an "as-is" basis, but Cerberus was hesitant to make the purchase without assurances from G.L. that the improvements

Lemich had made were proper and complied with applicable laws. (*Cerberus* Compl. ¶ 16, ECF No. 26-1).  Lemich felt that a sell to Cerberus would allow G.L. to continue leasing Comstock Storage, and in order to induce the transaction, Cerberus claims that G.L. "affirmatively and expressly represented" that the improvements were all up to code. (*Id.* ¶¶ 15–17).  Allegedly based on G.L.'s assurances, Cerberus purchased Comstock Storage on December 28, 2012 and allowed Lemich to remain as a lessee. (*Id.* ¶ 18).

Cerberus claims that it subsequently discovered that the improvements to Comstock Storage were not properly constructed and an inspection by the City of Reno allegedly determined that the primary buildings were "riddled with negligent and defective work and uninhabitable." (*Id.* ¶ 19).  In the end, Cerberus allegedly not only held title to defective construction, but it was also fined for noncompliant electrical wiring and it allegedly incurred costs in cleaning and removing "[h]azardous waste" that had been stored and spilled at Comstock Storage. (*Id.*).

Additionally, between 2004 and 2008, G.L. and Lemich "dumped substantial amounts of dirt" onto the property adjacent to Comstock Storage that Lemich claims he was leasing from TMWA. (Lemich Decl. ¶ 8).  On July 11, 2013, G.L. and Lemich discovered that a portion of that land did not belong to TMWA but rather it was owned by NNH. (*Id.* ¶ 27).  G.L. and Lemich were then sued in the Washoe County District Court by both Cerberus and NNH ("the *Cerberus* Action").

The *Cerberus* Action originally included five claims for relief: (1) negligence, (2) negligent misrepresentation, (3) intentional misrepresentation, (4) intentional property damage, (5) trespass, and (6) injunctive relief. (*Id.* ¶¶ 26–57).  All of these claims, except that for trespass, were alleged to involve only Comstock Storage.  The trespass claim alleged that during Lemich's

3

tenancy of Comstock Storage, G.L. had "dumped vast amounts of dirt and other debris onto NNH's property without "authorization or permission." (*Id.* ¶¶ 50–53).

When Lemich received a copy of the *Cerberus* complaint, he contacted Benchmark's third-party claims administrator requesting that Benchmark provide defense services pursuant to the Policy.  On August 2, 2013, the claims administrator denied the request, finding that G.L.'s actions were not covered by the Policy either because they did not constitute an "occurrence" or because they fell within exceptions to coverage as outlined in the Policy. (Westcap Letter 6, ECF No. 25-1).

On February 11, 2014, a first amended complaint ("the *Cerberus* FAC") was filed in the *Cerberus* Action in which Cerberus and NNH expanded on the original trespass cause of action by asserting two separate trespass claims: negligent trespass and intentional trespass. (*Cerberus* FAC ¶¶ 61–68, ECF No. 26-2).  Because the lawsuit in Washoe County was progressing and Benchmark refused to defend G.L., Lemich hired counsel to respond to Cerberus and NNH's allegations.  On March 4, 2014 and May 5, 2014, Lemich's counsel made additional demands on Benchmark to defend G.L. against the *Cerberus* Action based particularly on the newly alleged "negligent trespass" claim.  In his letter to Benchmark's claims administrator, G.L. and Lemich's counsel stated that G.L. and Lemich "were not responsible for dumping any type of material on the subject property after 2008." (Mar. 4, 2014 Letter, ECF No. 25-3).

On May 29, 2014, Benchmark again denied G.L.'s claim because it determined that (1) the dumping happened prior to the Policy's inception, (2) the statute of limitations barred NNH's claims, and (3) G.L.'s dumping was not an "occurrence" as defined by the Policy. (Hansard Letter 5–7, ECF No. 25-4).  Nevertheless, on June 25, 2014, Benchmark agreed to provide G.L. with a defense in the *Cerberus* Action under a reservation of rights. (Letter, ECF No. 25-6).

Benchmark also filed the present action seeking a declaratory judgment that the Policy does not cover property damage caused by G.L.'s intentional dumping.  G.L. and Lemich responded by filing a counterclaim against Benchmark alleging that the denial of G.L.'s insurance claim was done in bad faith.  On August 20, 2014, G.L. and Lemich moved for summary judgment on the issue of whether Benchmark had a duty to provide G.L. with a defense in the *Cerberus* Action. (ECF No. 20).  The Court denied the motion, initially finding that a genuine dispute of material fact existed as to whether G.L.'s dumping on NNH's property was the result of an honest and good faith mistaken belief on Lemich's part. (ECF No. 36).

Dissatisfied with the result, and claiming that the Court had clearly gotten it wrong, G.L. and Lemich moved the Court to reconsider its decision. (ECF No. 38).  Acknowledging the standard proposed by G.L. and Lemich, the Court proceeded to determine whether the previous Order should be set aside. (Jan. 9, 2015 Order, ECF No. 56).  Further evaluation convinced the Court that the factual dispute upon which its previous decision rested was immaterial given the fact that G.L. and Lemich began dumping dirt and other material on the property now owned by NNH as early as 2004. (*Id.* at 5–6).  The Court found that the Policy did not apply to G.L.'s alleged negligent trespass either because the dumping concluded prior to the Policy's inception or because the dumping would be deemed to have first taken place before the Policy's issuance. (*Id.*).  In any event, the motion for reconsideration was denied and the Court's prior decision to deny G.L. and Lemich's motion for summary judgment was reaffirmed.

Again claiming that the Court's conclusion was "both factually and legally flawed," G.L. and Lemich once more filed a motion for reconsideration on the Court's denial of summary judgment in their favor. (ECF No. 59).  Exasperated with what they perceived to be the Court's inability to grasp the difference between an insurer's duty to indemnify and its duty to defend,

1 G.L. and Lemich reiterated many of the arguments previously raised in their first motion for

2 reconsideration.  The Court, again finding no reason to set aside its October 29, 2014 Order,

3 denied the motion in brief fashion on February 11, 2015. (ECF No. 69).

4   On February 20, 2015, Benchmark filed the instant Motion for Summary Judgment.  The

5 parties' arguments both for and against summary judgment are quite similar to those included in

6 the various pleadings and motions already considered by the Court.  Benchmark maintains that

7 G.L.'s actions as alleged in the *Cerberus* FAC raise absolutely no potential for coverage under

8 the Policy.  G.L. and Lemich, however, argue that the possibility for coverage is plain from the

9 face of the *Cerberus* FAC and that Benchmark's denial of coverage amounts to bad faith worthy

10 of punitive damages.

11 **II. LEGAL STANDARD**

12   A principal purpose of the summary judgment rule is to "isolate and dispose of factually

13 unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  A

14 court grants summary judgment only if "the movant shows that there is no genuine issue as to

15 any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

16 56(a).  In making this determination, the court "must draw all reasonable inferences supported by

17 the evidence in favor of the non-moving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d

18 1054, 1061 (9th Cir. 2002).  "[T]his standard provides that the mere existence of *some* alleged

19 factual dispute between the parties will not defeat an otherwise properly supported motion for

20 summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  Rather,

21 only genuine issues of *material* facts are relevant to the summary judgment analysis.  A fact is

22 material if it "might affect the outcome of the suit under the governing law." *Id.* at 248.  "The

23 moving party bears the initial burden of establishing the absence of a genuine issue of material

24

1   fact." *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir. 2000).  The burden is

2   met by demonstrating to the court "that there is an absence of evidence to support the nonmoving

3   party's case." *Celotex Corp.*, 477 U.S. at 325.  This is done by citing to depositions, documents,

4   electronically stored information, affidavits or declarations, stipulations, admissions,

5   interrogatory answers, or other materials. Fed. R. Civ. P. 56(c)(1)(A).  Once the initial burden is

6   met, however, "Rule 56(e) requires the nonmoving party to go beyond the pleadings and identify

7   facts which show a genuine issue for trial." *Fairbank*, 212 F.3d at 531.

8          Moreover, where reasonable minds could differ on the facts proffered in support of a

9   claim, summary judgment should not be granted.  *Petzak v. Nevada ex rel. Dep't of Corr.*, 579 F.

10  Supp. 2d 1330, 1333 (D. Nev. 2008).  "Summary judgment is inappropriate if reasonable jurors .

11  . . could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521

12  F.3d 1201, 1207 (9th Cir. 2008).

13  **III.    DISCUSSION**

14         **A.  Insurer's Duty to Insured**

15         As the Court has previously explained, Nevada law recognizes "the special relationship

16  between the insurer and its insured." *Powers v. United Servs. Auto. Ass'n*, 962 P.2d 596, 603

17  (Nev. 1998).  Indeed, "[t]he relationship of an insured to an insurer is one of special confidence."

18  *Ainsworth v. Combined Ins. Co. of Am.*, 763 P.2d 673, 676 (Nev. 1988).  The contours of the

19  relationship are shaped by both the insurance contract and the law. *Allstate Ins. Co. v. Miller*,

20  212 P.3d 318, 330 (Nev. 2009).

21         When an insured is sued and tenders an insurance claim to the insurer, the insurer has two

22  latent duties to the insured.  The first is the duty to defend the insured against the pending action.

23  The duty to defend an insured against liability "attaches when the insured tenders defense of the

24

1    lawsuit to the insurer." *Id.*  The second is the duty to indemnify the insured for any judgment of

2    damages resulting from the lawsuit.  The duty to indemnify attaches only if the insured is

3    actually found liable of the alleged harm. *United Nat'l Ins. Co. v. Frontier Ins. Co.*, 99 P.3d

4    1153, 1158 (Nev. 2004).

5        "The duty to defend [the insured] is broader than the duty to indemnify." *Id.*  While the

6    duty to indemnify arises only once liability is proven, *id.* at 1157, the duty to defend is triggered

7    if the claim "potentially seeks damages within the coverage of the policy," *Rockwood Ins. Co. v.*

8    *Federated Capital Corp.*, 694 F. Supp. 772, 776 (D. Nev. 1988).  "This means only that if facts

9    are alleged which if proved would give rise to the duty to indemnify, the insurer must defend."

10   *Id.*  Once the duty to defend arises, it "continues throughout the course of the litigation." *United*

11   *Nat'l Ins. Co.*, 99 P.3d at 1158 (citing *Home Sav. Ass'n v. Aetna Cas. & Surety*, 854 P.2d 851,

12   855 (1993)).  And where there is any doubt whether the duty to defend applies, "this doubt must

13   be resolved in favor of the insured." *Id.*

14       However, "the duty to defend is not absolute." *Id.* (citing *Aetna Cas. & Sur. Co. v.*

15   *Centennial Ins. Co.*, 838 F.2d 346, 350 (9th Cir. 1988)).  "The potentiality of covered liability is

16   the test." *Rockwood Ins. Co.*, 694 F. Supp. at 776 (citing *Cont'l Cas. Co. v. City of Richmond*,

17   763 F.2d 1076 (9th Cir. 1985)).  "A potential for coverage only exists when there is arguable or

18   possible coverage." *United Nat'l Ins. Co.*, 99 P.3d at 1158.  To determine whether the insured's

19   claim gives rise to arguable or possible coverage, the court must compare "the allegations of the

20   complaint and the facts known to the insurer" with the terms of the policy. *Gary G. Day Constr.*

21   *Co. v. Clarendon Am. Ins. Co.*, 459 F. Supp. 2d 1039, 1050 (D. Nev. 2006) (citing *United Nat'l*

22   *Ins. Co.*, 99 P.3d at 1158).

23   ///

24

**B.  The Policy**

The relevant portions of the Policy are as follows:

SECTION I – COVERAGES

COVERAGE A. **BODILY INJURY** AND **PROPERTY DAMAGE** LIABILITY

. . .

This insurance applies to **bodily injury** and **property damage** only if:

(1) The **bodily injury** or **property damage** is caused by an **occurrence** . . .

(2) The **bodily injury** or **property damage** is caused by an **occurrence** which takes place during the **policy period** regardless of whether or not such **occurrence** is known or apparent to anyone; and

(3) The **bodily injury** or **property damage** resulting from such **occurrence** first takes place during the **policy period**, regardless of when the **bodily injury** or **property damage** becomes known or apparent to anyone.

c. All **bodily injury** or **property damage** arising from an **occurrence**, or series of related **occurrences**, will be deemed to first take place at the time of the first such **bodily injury** or **property damage**, even though the **occurrence** giving rise to such **bodily injury** or **property damage** may be continuous or repeated exposure to the same generally harmful conditions . . . .

. . .

EXCLUSIONS: COVERAGES A AND B

. . .

J. DAMAGE TO PROPERTY

**Property damage** to:

(1) Property any **insured** owns, rents, or occupies, including any costs or expenses incurred by any **insured**, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

. . .

SECTION V – DEFINITIONS

. . .

15. **OCCURRENCE**

**Occurrence** means an accident, including a continuous or repeated exposure to substantially the same generally harmful condition.

. . .

(Ins. Agreement, ECF No. 4, at 30–156).

**C. Analysis**

Benchmark argues that by comparing the facts alleged in the *Cerberus* FAC to the terms of the Policy it is clear that there is no potential for coverage in this case.  First, Benchmark contends that the various acts alleged in the *Cerberus* FAC were committed by Lemich in his personal capacity rather than within his duties as an agent for Benchmark, which would preclude coverage.  Second, Benchmark argues that the property damage suffered by NNH first occurred prior to the inception of the Policy, which would prevent coverage under the Policy's "deemer" provision.  Third, Benchmark maintains that G.L. and Lemich's actions do not constitute an "occurrence" under the Policy since they were done intentionally.  Fourth, Benchmark asserts that the Policy's "pollution" exclusion precludes coverage as well.

The Court finds that the second reason offered by Benchmark is dispositive in this case. Benchmark has no duty to provide G.L. with a defense in the *Cerberus* Action because (1) coverage for the causes of action arising from Lemich's alleged improper modification of Comstock Storage is precluded by the Policy, and (2) the alleged damage to NNH's property first occurred prior to the Policy's issuance in October 2009.

///

10

**1. The Policy precludes coverage for damage done to property the insured owns, rents, or occupies**

The Policy explicitly excludes coverage for damage caused by the insured to property that the insured "owns, rents, or occupies." (*Id.* at 44). At the time Benchmark denied G.L.'s tender, the only information available to the claims administrator were the allegations in the *Cerberus* FAC and the statements made by G.L. and Lemich's counsel in the demand letter. The *Cerberus* FAC alleged that G.L. "and/or" Lemich "owned, constructed, repaired and remodeled" Comstock Storage and that G.L. "and/or" Lemich represented that the improvements on [Comstock Storage] were properly permitted, constructed, repaired, and remodeled and otherwise complied with all applicable laws and building code provisions." (*Cerberus* FAC ¶¶ 7–8, ECF No. 26-2).

The harm alleged in the *Cerberus* Action includes damages for improper construction of the primary building at Comstock Storage as well as fines imposed on Cerberus for noncompliant wiring. (*Id.* ¶ 19). The *Cerberus* FAC also complains that G.L. "and/or" Lemich caused Cerberus lost rents and additional costs and expenses relating to "vandalizing" and "tearing down" other improvements to Comstock Storage.

Indeed, the first four causes of action in the *Cerberus* FAC—negligence, negligent misrepresentation, intentional misrepresentation, and intentional damage to property—all claim that G.L. engaged in behavior during its occupancy of Comstock Storage that resulted in damage to Cerberus. It appears on the face of the *Cerberus* FAC that G.L. was a possible owner of Comstock Storage, or at the very least that G.L. occupied the property. Regardless of the fact that Lemich actually owned and leased the property during the relevant time period, the parties cannot dispute that G.L. jointly used and occupied Comstock Storage as G.L. equipment was stored there. (*See* Lemich Decl. ¶ 15).

Furthermore, Lemich claims in an unqualified manner that any improvements that were made to Comstock Storage were made by Lemich himself and not in his capacity as an officer or employee of G.L. (*See* Lemich Decl. ¶ 10).  It is undisputed that G.L. is the only party insured under the Policy and that Lemich is covered only in his capacity as a G.L. officer or as a G.L. employee. (Ins. Agreement, ECF No. 4, at 31, 52).  Since the modifications made to Comstock Storage were performed by Lemich in a personal capacity, the negligence and intentional damage to property claims could not be covered by the Policy.  Moreover, the misrepresentation claims do not allege any property damage or bodily injury and would likewise not be covered by the Policy.  There is therefore no potential coverage under the Policy as to the first four causes of action as alleged in the *Cerberus* FAC.

### 2. The harm to NNH's property might constitute an "occurrence" under the Policy

The seventh cause of action[1] alleged in the *Cerberus* FAC states that during their ownership and tenancy of Comstock Storage, G.L. and Lemich "negligently dump[ed] vast amounts of dirt and other debris onto [NNH's property] . . . causing physical harm . . . ." (*Cerberus* FAC ¶ 63).  The eighth cause of action[2] alleges that G.L. and Lemich "intentionally and in violation of NNH's right of exclusive possession dumped vast amounts of dirt and other debris onto [NNH's property]." (*Id.* ¶ 68).  The question arising from these causes of action is whether they allege an "occurrence" such that G.L.'s actions are potentially covered.

"Occurrence" is defined by the Policy as "an accident, including a continuous or repeated exposure to substantially the same generally harmful condition." (Ins. Agreement at 59).  The Policy does not define "accident," but the Nevada Supreme Court has held that an "accident" is

---

[1] In the *Cerberus* FAC, the negligent trespass claim is mislabeled as the fifth claim for relief, but it is clear from the sequential order that it should be titled the "Seventh Claim for Relief." (*See Cerberus* FAC 11, ECF No. 26-2).
[2] In the *Cerberus* FAC, the intentional trespass claim is mislabeled as the fifth claim for relief, but it is clear from the sequential order that it should be titled the "Eighth Claim for Relief." (*Id.*).

1  "a happening that is not expected, foreseen, or intended." *Beckwith v. State Farm Fire & Cas.*

2  *Co.*, 83 P.3d 275, 276 (Nev. 2004).  A non-accidental intentional act has been excluded as an

3  accident even where the resulting harm was unintended. *Id.*  And "the Nevada Supreme Court

4  has indicated that a negligent act that allows damage to occur does not fall under the commonly

5  understood meaning of an accident in some circumstances." *Big-D Constr. Corp. v. Take It For*

6  *Granite Too*, 917 F. Supp. 2d 1096, 1108 (D. Nev. 2013) (citing *Fire Ins. Exch. v. Cornell*, 90

7  P.3d 978, 980 (Nev. 2004)).

8          G.L.'s dumping onto NNH's property, therefore, would likely not be considered an

9  "occurrence" under Nevada law because the dumping constituted an intentional act.

10  Nevertheless, even though the act of dumping itself may not be an "occurrence" due to its

11  intentional nature, the harmful consequences that resulted therefrom might still be considered an

12  accident if the damage was "unexpected, unforeseen, and unintended." *Id.*  The focus under

13  Nevada law to determine whether an "accident" has occurred "is on the insured's intentions

14  and/or expectations with respect to the resulting *harm*." *Am. Family Mut. Ins. Co. v. Newman*,

15  No. 3:06-cv-00464-BES-VPC, 2008 WL 706630, at *3 (D. Nev. Mar. 14, 2008) (Sandoval, J.)

16  (quotations and citation omitted).

17          In this case, G.L. and Lemich claim that they did not intend to harm the property now

18  owned by NNH when G.L. dumped substantial amounts of dirt and debris onto the land.  Lemich

19  maintains that he was under a mistaken yet good faith belief that the land onto which G.L. was

20  dumping belonged to TMWA, from whom Lemich claims to have received permission.  This

21  mistake, G.L. and Lemich argue, demonstrates that G.L. did not intend to damage NNH's

22  property and any harm that did arise was accidental and therefore an "occurrence" under the

23  Policy.  Benchmark disputes these assertions and contests Lemich's good faith belief, citing the

24

13

1   deposition of NNH's principal, Robert Fitzgerald, that it believes shows that Lemich knew that

2   he did not have permission to dispose of the dirt where G.L. trucks were dumping the materials.

3   (*See* Fitzgerald Dep. 77:16–78:15, ECF No. 25-8).

4          This factual dispute is material to whether G.L.'s actions constitute an "accident" and

5   thus an "occurrence" under the Policy, and it would preclude summary judgment if the issue

6   were controlling in this case.  However, even if the damage alleged in the *Cerberus* FAC were

7   accidental in that G.L. did not expect or foresee any harm to NNH's property, Defendants have

8   failed to demonstrate that coverage could otherwise potentially be triggered given the Policy's

9   "deemer" provision.

10          **3.  The Policy's "deemer" provision precludes coverage for the damage
                 allegedly caused to NNH's property**

11

12          Despite the factual dispute regarding Lemich's intentions and mistaken belief regarding

13   G.L.'s dumping site, the Court finds that summary judgment in Benchmark's favor is

14   nonetheless warranted because the property damage alleged in the *Cerberus* FAC is deemed to

15   have first taken place prior to the Policy's issuance pursuant to its terms.

16          The *Cerberus* FAC itself does not contain any allegations as to when the dumping first

17   began or when NNH last noticed G.L. trucks dumping dirt and debris on its property.

18   Presumably, the alleged dumping occurred sometime between December 28, 2012 and April 16,

19   2013 as these dates appear to be the time period relevant to the *Cerberus* Action.  In G.L.'s

20   demand letter to Benchmark's administrator, G.L. and Lemich explained that they "were not

21   responsible for dumping any type of material on the subject property after 2008," (Mar. 4, 2014

22   Letter, ECF No. 25-3), implying that dumping did occur prior to 2008.

23

24

14

Based on this information, Benchmark determined that it had no duty to defend against the trespass claims since at least some of the dumping giving rise to the alleged property damage had occurred before the Policy's issuance.  The Court agrees with this position.

The Policy unambiguously states that coverage exists only if the property damage at issue was caused by an "occurrence" that takes place during the policy period *and* if the property damage at issue "first takes place during the policy period." (*Id.* at 41).  The Policy goes on to state that all "property damage arising from an occurrence, or series of related occurrences, will be deemed to first take place at the time of the first such . . . property damage . . . ." (*Id.*).

The *Cerberus* FAC along with the information available to Benchmark at the time coverage was denied indicated that G.L. and Lemich dumped dirt and debris on the property now owned by NNH prior to the Policy's inception in October 2009.  Accordingly, the property damage first took place before the "policy period," (Ins. Agreement at 41), and the alleged harm is not covered by the Policy.

The Court notes that Benchmark did not conduct an investigation to determine whether the Policy's coverage was triggered before it declined to defend G.L. in the *Cerberus* Action.  Rather, Benchmark simply took the terms of the Policy and compared it to the *Cerberus* FAC in light of the information provided by G.L. and Lemich in the demand letter to determine whether there was any potential for coverage.  The demand letter stated that no dumping had occurred after 2008, a position that Lemich has maintained throughout the current litigation, (*see* Lemich Decl. ¶¶ 8, 31–34).  Certainly Benchmark was not required to simply turn a blind eye towards facts offered to it by G.L. and Lemich that negated a potential for coverage.  Neither should the Court now pretend that G.L. never informed Benchmark that the dumping occurred prior to the Policy's issuance.

15

1    G.L. and Lemich argue that the actual facts surrounding G.L.'s dumping are irrelevant to

2    Benchmark's duty to provide a defense in the *Cerberus* Action because the *Cerberus* FAC

3    alleges that at least some dumping occurred during the policy period, between December 2012

4    and April 2013.  This argument ignores the unambiguous terms of the Policy.  There is a

5    potential for coverage only if the property damage alleged in the underlying lawsuit first takes

6    place during the policy period.  In their demand letter, G.L. and Lemich made it clear that at least

7    some dumping took place before 2008, which means that at least some of the property damage

8    alleged by NNH in the *Cerberus* Action took place before 2008.  Since any property damage that

9    arises from an "occurrence" or "series of related occurrences" is deemed to first take place when

10   the property damage first occurs, the damage to NNH's property necessarily falls outside the

11   scope of coverage.

12   Defendants find this conclusion unsound because they disagree that repeated dumping in

13   the same general location over the course of four years constitutes "related occurrences." (Resp.

14   36–37, ECF No. 78).  G.L. and Lemich argue that in order for G.L.'s alleged dumping in 2012

15   and 2013 to be related to the dumping that occurred prior to 2008, there must be "either a logical

16   or causal connection." (*Id.* at 37).  If G.L. did dump dirt onto NNH's property as the *Cerberus*

17   FAC alleges, Defendants fail to persuade the Court that the span of time between when the

18   dumping first began and when it allegedly ended in 2013 disrupted what otherwise appears to be

19   a series of related occurrences.

20   Each time G.L. dumped dirt and debris onto the property now owned by NNH, there was

21   exposure to a harmful condition that presumably caused property damage.  The damage that

22   would have arisen from the alleged dumping in 2012 and 2013 would have resulted in NNH's

23   property being exposed to the same general harmful condition to which the property was

24

1   subjected before 2008, namely substantial amounts of dirt and debris.  The Court finds that

2   property damage resulting from G.L.'s alleged trespasses in 2012 and 2013 would be related to

3   the damage that occurred prior to 2008 since it would have arisen from the same party engaged

4   in the same action to dispose of the same material in the same location that produced the same

5   form of property damage giving rise to NNH's claim.

6          Accordingly, even if NNH were able to prove that G.L. negligently trespassed on its

7   property in 2012 and 2013, the property damage caused by G.L.'s alleged actions would, under

8   the Policy, be deemed to have occurred when the property damage first took place.  It is

9   undisputed that at least some of the dumping occurred before the Policy's inception in 2008.

10  Thus, the property damage alleged in the *Cerberus* FAC first took place before the policy period

11  and is not covered by the Policy itself.

12         Benchmark is not obligated to defend or indemnify G.L. in the *Cerberus* Action.[3]  There

13  is therefore also no basis for G.L. and Lemich's counterclaim for bad faith and punitive damages.

14  Benchmark's Motion is granted.

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22

23

24

---

[3] There are two additional causes of action raised in the *Cerberus* FAC—breach of contract and quantum meruit. (*See Cerberus* FAC ¶¶ 49–60, ECF No. 26-2).  These claims allege that G.L. and Lemich breached the lease agreement with Cerberus by remaining on Comstock Storage while failing to make rent payments.  Since these claims do not allege either property damage or bodily injury, they are not covered by the Policy and Benchmark has no obligation to defend G.L. as to these claims.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**CONCLUSION**

IT IS HEREBY ORDERED that Benchmark's Motion for Summary Judgment (ECF No. 74) is GRANTED.

IT IS FURTHER ORDERED that the Motions to File Excess Pages (ECF No. 77, 80) are GRANTED.

IT IS SO ORDERED.


DATED this 13th day of April, 2015.

_____
ROBERT C. JONES
United States District Judge

18